UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| AJMAL STEEL TUBES & PIPES IND. LLC,  :<br>                                                                          :<br>                              *Plaintiff*,               :<br>                                                                          :  Court No. 21-00587<br>              v.                                               :  Jane A. Restani, Senior Judge<br>                                                                          :<br>UNITED STATES,                                  :<br>                                                                          :<br>                              *Defendant*,           :<br>                                                                          :<br>WHEATLAND TUBE COMPANY,   :<br>                                                                          :<br>                    *Defendant-Intervenor.*:  |  |

### **PLAINTIFF AJMAL'S REPLY TO**
### **BRIEFS IN OPPOSITION TO PLAINTIFF'S**
### **MOTION FOR JUDGMENT ON THE AGENCY RECORD**

David G. Forgue

**BARNES, RICHARDSON & COLBURN, LLP**
303 East Wacker Drive
Suite 305
Chicago, Illinois 60601
(312) 565-2000

Counsel for Ajmal Steel Tubes & Pipes Ind. LLC

Dated:  August 26, 2022

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.       ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  The Record Supports the Conclusion that Ajmal's Technical Difficulties and Operational Adjustments Caused by the COVID-19 Pandemic Constituted "Extraordinary Circumstances" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    B.  The Record Supports the Conclusion that Ajmal Cooperated to the Best of It's Ability in the Review, Rendering the Use of An Adverse-Facts Available Rate an Abuse of Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    C.  Commerce's Application of the Adverse Facts Available Rate in this Case is Disproportionate, Punitive and Not Supported by the Record . . . . . . . . . . . . . . . . . . . . .14

II.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

# **TABLE OF AUTHORITIES**

**Cases**

Autoliv ASP Inc. v. United States, 422 F. Supp. 3d 1295 (CIT 2019) . . . . . . . . . . . . . . . . . . . . . 4

Chaparral Steel v. United States, 901 F.2d 1097 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . .2

Dongtai Peak Honey Indus. v. United States, 777 F.3d 1343 (Fed. Cir. 2015) . . . . . . . . . . . . . . 9

Neo Solar Power Corp. v. United States, 190 F. Supp. 3d 1255, 1262-3 (CIT 2016) . . . . . . . . . 7

Nippon Steel Corp. v. United States, 337 F.3d 1373 (Fed. Cir 2003) . . . . . . . . . . . . . . . . . . . . . 11

PSC VSMPO-Avisma Corp. U.S., 688 F.3d 751 (Fed. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . .9

Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990) . . . . . . . . . . . . . . . 2

Tau-Ken Temir LLP v. United States, Slip Op. 22-82 (CIT July 14, 2022) . . . . . . . . . . . . . .13, 14

**Statutes**

19 U.S.C. 1516a(b)(1)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

19 U.S.C. §1677e(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| AJMAL STEEL TUBES & PIPES IND. LLC, :<br>　　　　　　　　　　　　　　　　　　　　　：<br>　　　　　　　　　　*Plaintiff*,　　　　　：<br>　　　　　　　　　　　　　　　　　　　　　：<br>　　　　v.　　　　　　　　　　　　　　　：<br>　　　　　　　　　　　　　　　　　　　　　：<br>UNITED STATES,　　　　　　　　　　　：<br>　　　　　　　　　　　　　　　　　　　　　：<br>　　　　　　　　　　*Defendant*,　　　　：<br>　　　　　　　　　　　　　　　　　　　　　：<br>WHEATLAND TUBE COMPANY,　　　　：<br>　　　　　　　　　　　　　　　　　　　　　：<br>　　　　　　　　　　*Defendant-Intervenor.*：<br>　　　　　　　　　　　　　　　　　　　　　： | Court No. 21-00587<br>Jane A. Restani, Senior Judge |

**PLAINTIFF AJMAL'S REPLY TO
BRIEFS IN OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

　　　　Pursuant to Rules 56.2 and 81 of this Court, Plaintiff Ajmal Steel Tubes & Pipes Ind. LLC ("Ajmal") respectfully submits this response to Defendant and Defendant-Intervenor's respective briefs in opposition to Plaintiff's Motion for Judgment on the Agency Record. Defendant's brief is cited as "Df. Br." while Defendant-Intervenor's brief is cited as "DI Br." As discussed below, Plaintiff has demonstrated that Commerce acted without substantial record evidence and abused its discretion in denying Ajmal's out of time request for an extension to file its Section A response and subsequently rejecting the delayed Section A response. Plaintiff has also demonstrated that the record evidence does not substantially support Commerce's determination to apply an adverse-inference-based rate of 54.27% to Ajmal in light of the untimely filings.

1

## SUMMARY OF ARGUMENT

Commerce decisions must reflect two core principles of antidumping duty law: (1) the antidumping duty law is remedial, not punitive, <u>Chaparral Steel v. United States</u>, 901 F.2d 1097, 1103 (Fed. Cir. 1990), and (2) Commerce is legally obligated to effectuate the purposes of the antidumping statute, which is to calculate antidumping duties "as accurately as possible." <u>Rhone Poulenc, Inc. v. United States</u>, 899 F.2d 1185, 1191 (Fed. Cir. 1990). Any decision made by Commerce that contravenes these principles must be justified by the agency based on substantial evidence when reviewing the record as a whole. In this case Commerce has failed to meet that standard.

When viewed in the full context of the record and the reality of global conditions in April 2020, Ajmal's technical difficulties constituted "extraordinary circumstances" under the regulations. This is true notwithstanding the selective and incomplete use of record evidence and decontextualized characterizations of record evidence offered by Defendant and Defendant-Intervenor. When viewed as a whole and in context, the record in this matter clearly shows that Commerce acted without substantial evidence on the record and abused its discretion in denying Ajmal's out of time extension request and subsequently rejecting the Section A filing in this review.

In addition, when the record in this matter is reviewed as a whole, Ajmal and personnel at Barnes, Richardson & Colburn acted to the best of their respective abilities to provide timely and accurate information to the agency. The United States continues to apply circular reasoning to its "best of its ability" analysis by ultimately concluding that the untimely filing is evidence of not acting to the best of the company's ability. This reasoning is conclusory, superficial, and

unsupported by record evidence. Therefore, the decision to apply an adverse inference to Ajmal's antidumping duty rate calculation is unsupported by the record and contrary to law.

Finally, the application of Adverse Facts Available in the calculation of the antidumping duty rate applied to Ajmal's imports was disproportionate, punitive, and the record reflects that it was not needed as incentive to gain Ajmal's cooperation.

I. ARGUMENT[1]

A. The Record Supports the Conclusion that Ajmal's Technical Difficulties and Operational Adjustments Caused by the COVID-19 Pandemic Constituted "Extraordinary Circumstances"

The record in this case shows that Commerce's determination that extraordinary circumstances did not exist and subsequent denial of Ajmal's out of time extension request, as well as decision to reject Ajmal's delayed Section A response, is unsupported by record evidence and is an abuse of discretion. Both Defendant and Defendant-Intervenor rely on the selective use of record facts and present record information devoid of context in their respective attempts to support Commerce's determination. When viewed as a whole and with appropriate context the record makes clear that Commerce's decision was an abuse of discretion and unsupported by record evidence.

Ajmal notes that Defendant quotes the Federal Register notice implementing the "extraordinary circumstances" requirement, indicating that Commerce considered examples to be "natural disaster, riot, war, force majeure, or medical emergency." Df. Br. at 11. Defendant also notes that "inattentiveness, or the inability of the party's representatives to access the Internet on the day of on which the submission was due" would not be considered extraordinary circumstances. Df. Br. at 11. Defendant then characterizes the technical issues that prevented

---

[1] Plaintiff Ajmal reiterates and preserves all arguments presented previously in this matter.

3

timely filings in this matter as "mundane." Df. Br. at 11. The Defendant's characterization of extraordinary circumstances is misguided because it does not examine the record as a whole. See Autoliv ASP Inc. v. United States, 422 F. Supp. 3d 1295, 1299 (CIT 2019). The reason a natural disaster or instance of force majeure would impact a filing is very likely that the parties would not be able to communicate or have access to the internet to upload their filings. However, Commerce, by citing the Federal Register, recognizes that an intervening natural disaster or force majeure would be an "extraordinary circumstance." As demonstrated by the record in this case and discussed in greater detail below, COVID-19 and the restrictions imposed both in Washington, D.C. and abroad in response to COVID-19 presented extraordinary circumstances with respect to the specific filings in this case. These extraordinary circumstances hampered communications among Plaintiff, its dispersed personnel, its counsel, and counsel's dispersed personnel and frustrated the ability to complete the filing or to timely request an extension when confronted with the data submission problem. In the absence of the world-wide COVID-19 restrictions Ajmal would have been able to generate the required information in a timely manner and to communicate it to counsel, who in turn would have had its full complement of in-office resources generally available for filings of this magnitude. For these reasons, the impact on the facts set out in the record of COVID-19, the restrictions imposed by municipalities during the early days of the pandemic to combat the virus, and the immediate requirement that employees work from home align with a natural disaster or a force majeure event[2] rather than mere "inattentiveness" or a lack of Internet access.

---

[2] It should be noted that COVID-19 has been claimed as the basis for excusing contract performance under force majeure clauses across the United States. See Bagger, Paula M., The Importance of Force Majeure Clauses in the COVID-19 Era, https://www.americanbar.org/groups/litigation/committees/commercial-business/boilerplate-contracts/force-majeuree-clauses-contracts-covid-19/ (last viewed August 24, 2022).

The response briefs in this matter are replete with arguments that fail to address the entire record. First, Defendant attempts to minimize the relationship between Commerce's tolling memoranda and the pervasive effects of COVID-19 on work by stating that "Commerce tolled the deadlines in response to 'unprecedented workloads'" Def. Br. at 13. This is a mischaracterization of the tolling memoranda, since both documents explicitly address the specific impact that working in the COVID-19 environment was having on the agency. The first tolling memorandum explicitly characterizes itself as a response to "operational adjustments *due to COVID-19* . . ." PR 51 at 1-2 (emphasis added). The second stated that "{o}perational considerations *due to COVID-19* . . . continue to exist." PR 73 at 1 (emphasis added). The record contains no evidence that tolling had been used previously simply because of "unprecedented workloads" and no record evidence that this is why these tolling memoranda were issued. Instead, the Department of Commerce recognized the challenge of working in the early COVID-19 environment ("operational adjustments") and made an extraordinary decision to toll all deadlines. Defendant's selective use of record facts to attempt to downplay the extraordinary circumstances under which work was conducted during the early days of COVID-19 does not comport with the record evidence.

Similarly, the United States attempts to characterize as "mundane" the circumstances Ajmal faced with respect to the Section A filing and, the extension filing by arguing that "Ajmal waited until the day of the deadline to provide the Section A response to its counsel," and that "Ajmal failed to timely file because it did not give itself enough time . . ." Def. Br. at 11. This rationale ignores the record evidence that communications with Ajmal were delayed because of "foreign government restrictions due to COVID-19." PR 50 at 2, see also PR 53 at 7. The pandemic was global and individual countries imposed different restrictions, often with little

notice. Ajmal indicated in the Request for Reconsideration of Extension Denial that it was impacted by government restrictions due to COVID-19 and that those restrictions delayed communication, causing the Section A response to be delayed. By removing the context of the circumstances of the pandemic as they existed in March and April 2020 and record evidence that those conditions impacted this filing, Commerce and the United States ignore the extraordinary uncertainty, difficulty, and other circumstances faced by the parties at the time of this filing.

Third, Defendant indicates that it is "difficult to see how" Ajmal was not able to file a timely extension request, even if it could not file the Section A response timely. Def. Br. at 13. This difficulty is resolved by reviewing the record. In the First Request for Reconsideration of Extension Denial, PR 50 at 4-5 and the Second Request for Reconsideration of Extension Denial, PR 53 at 5-6, Attachment 2 ¶10 the technical difficulties are recounted in detail. As stated in those documents, the efforts to complete an extension request in accordance with Commerce's regulations was impacted by the same technical difficulties that prevented the timely filing of the Section A response in the first place. Furthermore, the Second request makes it clear that a major issue was the "reduced collaborative resources from colleagues" caused by the COVID-19 restrictions against in-person office work. PR 53 Attachment 2 ¶12. But for the COVID-19 work restrictions imposed by the District of Columbia other colleagues working in the Barnes, Richardson & Colburn office would have learned of the issue immediately and been available (with their hardware and software) to assist. In the COVID-19 work-from-home environment, however, communication and collaboration were negatively impacted. As the record reflects, this led to the extraordinary circumstance in which the at-home employee's hardware and software malfunctioned and engaging other resources for assistance was more difficult and time consuming than in a non-COVID-19 environment where a colleague would have been working

in an adjoining office. Thus, record evidence makes clear how the extraordinary circumstances that arose while Section A was being filed also prevented the filing of an extension request before 5:00 p.m.

Fourth, the United States relies on the agency's need for deadlines to be met so the agency can meet its statutory and regulatory deadlines in reviews. Def. Br. at 16-17. Ajmal does not and has not challenged this principle. Ajmal, however, does challenge the reasonableness of repeatedly declining Ajmal's requests to extend the deadline and accept the Section A response based on the entirety of the record in this matter. Once, the Department of Commerce extended all existing its deadlines in reviews by 50 days on April 24, 2020 neither the alleged prejudice to Commerce in this matter nor the "general prejudice stemming from late filings because of the strict statutory deadlines governing its determination" could, in fact, justify rejecting Ajmal's request and Section A response. Quotation from Def. Br. at 17 (citing Neo Solar Power Corp. v. United States, 190 F. Supp. 3d 1255, 1262-3 (CIT 2016)). After Commerce had tolled all deadlines by 50 days, it was presented with a second request for reconsideration and a Brief Contesting Preliminary Determination Pertaining to Ajmal (PR 115), which it denied. Commerce then tolled all deadlines an additional 60 days (PR 73), and then granted itself a regulatory 120-day extension of the deadlines in this case. Despite having given itself 230 extra days to reach its decision in this matter, Commerce and now the United States continue to claim that Commerce was prejudiced by the late filings. As demonstrated by the record in this case, and as discussed above, Commerce tolled deadlines by 110 days "due to COVID-19" operational adjustments and then extending its deadlines 120 more days while denying Ajmal's COVID-19-impacted 6:11 p.m. extension request based, in part, on prejudice to the agency's ability to meet statutory deadlines. The record evidence in this matter indicates that Commerce suffered no prejudice and

7

had several opportunities to grant Ajmal's requests after this lack of prejudice became clear. Failure to do so was unreasonable and an abuse of discretion.

In addition, the United States seeks to support Commerce's decision to reject the extension request and Section A filing by noting that Commerce stated that the firm could have "enlist{ed} help of other paralegals and/or attorneys to upload the submission or separated the submission into smaller more manageable files," or ". . . notify Commerce through any means, official or unofficial, before the deadline." Df. Br. at 11. As the United States is aware, the record shows that, in fact, at least one additional attorney did begin assisting with the filing. PR 50 at 3-4. Furthermore, the record shows that *because of Commerce's remote work environment* the decision was made to attempt to file a formal extension request instead of "informal" contact. PR 53 at Attachment 2 ¶ 10. The decision to seek to file a formal extension request is, along with the impaired communications between the attorneys and the client, and the changes caused by the COVID-19 restrictions, and additional instance in which COVID-19 and restrictions made because of it acted as direct intervening causes that contributed to the extraordinary circumstances that prevented the timely filing of the extension request and Section A response. Ultimately that formal extension request was delayed by the same technical difficulties that were impairing a timely Section A response. PR 50 at 4. The record evidence in the matter clearly indicates that Ajmal took the steps Commerce believed a reasonable party not facing extraordinary circumstances would have taken, so that failure to grant Ajmal's requests was unreasonable and an abuse of discretion.

Defendant-Intervenor also fails to view the record as a whole in their Response Brief. Thus, Defendant-Intervenors state that "teleworking is not an 'extraordinary circumstance.'" DI Br. at 9. In a similar vein Defendant-Intervenor states that "there is no evidence that any BRC

attorney or staff member was ill on the day of the deadline," DI Br. at 9-10. These arguments mischaracterize the extraordinary circumstances that were implicated with respect to the Section A and extension request filings. Telework was not an extraordinary circumstance and was not claimed to be. Similarly, there is no allegation that any employee of the firm was sick at the time of the filing. Instead, as discussed in depth above, the combination of global COVID-19 restrictions restricting communications (PR 53 at 7), local COVID-19 restrictions prohibiting in-office work, which resulted in changes to the hardware, software, and support structures normally used for large filings (PR 53 at 5-6, Attachment 2 ¶¶ 10, 12), and computer failures created extraordinary circumstances in this instance that made it impossible for the Section A response or the extension request to be filed timely. The intervening nature of COVID-19 and the accompanying restrictions is clearly documented, and Commerce abused its authority and acted contrary to record evidence in this matter in denying Ajmal's requests to file those documents untimely.

Finally, Defendant's[3] reliance on PSC VSMPO-Avisma Corp. U.S., 688 F.3d 751, 761 (Fed. Cir. 2012) is inapposite. Ajmal is not asking this Court to "set aside application of a proper administrative procedure" as cited by Defendant. Df. Br. at 16. Ajmal is asking the Court to exercise the judicial authority set forth in 19 U.S.C. 1516a(b)(1)(B)(i). This is a very different exercise and one that is a necessary component of the administrative law system in the United States. Commerce's decision to deny Ajmal's extension request and subsequently reject the Section A filing abused Commerce's discretion and is not supported by substantial evidence on

---

[3] Defendant-Intervenor appears to have also attempted to cite this language, although it was attributed to Dongtai Peak Honey Indus. v. United States, 777 F.3d 1343, 1351 (*sic*) (Fed. Cir. 2015) absent the internal citation at DI Br. 8-9. The citation is also inapposite as used by Defendant-Intervenor. Defendant-Intervenor does cite PSC VSMPO at DI Br. at 19. That citation is inapposite for the reasons discussed above.

9

the record. Evaluating the agency's application of its regulations considering the law is an entirely appropriate activity for the Court.

Based on the whole record in this matter, Commerce acted unreasonably and contrary to the record when it denied Ajmal's requests for an extension of time to file its Section A response and when it rejected Ajmal's Section A response.

B. The Record Supports the Conclusion that Ajmal Cooperated to the Best of Its Ability in this Review, Rendering the Use of An Adverse-Facts Available Rate an Abuse of Discretion

The record in this matter does not support Commerce's determination that it was appropriate to apply an adverse inference to the calculation of Ajmal's antidumping duty rate. The record, when viewed as a whole and in context, shows that both Ajmal and Barnes, Richardson & Colburn always acted to the best of their respective abilities to file both Section A and the extension request on time. In addition, the arguments used to support Commerce's determination in the response briefs are ultimately circular or not probative of the effort applied to this filing. In all cases they are unsupported by the record.

Defendant indicates that "Ajmal failed to cooperate to the best of its ability within the meaning of 19 U.S.C. §1677e(b)(1) *because of* its unjustified failure to file the Section A response by the deadline . . ." Df. Br. at 18. Thus, Commerce and Defendant are using the determination denying the extension request and refusing to accept the Section A filing as the *entire and sole* rationale for the conclusion that Ajmal did not act to the best of its ability within the meaning of 19 U.S.C. §1677e(b)(1). As demonstrated in I.A. above, the determination to deny the extension request and refuse to accept Section A was unsupported by the entire record and was an abuse of discretion. Therefore, the determination that Ajmal did not use its best

efforts within the meaning of 19 U.S.C. §1677e(b)(1) is also without support of the entire record and an abuse of discretion.

Defendant further indicates that "{a}s Ajmal concedes,[4] the best of its ability standard does not require perfection but does not condone inattentiveness, carelessness, or inadequate record keeping," citing Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382-83 (Fed. Cir 2003). Defendant then lists several examples that it claims reflect "inattentiveness, carelessness, or inadequate record keeping." Df. Br. at 19. These examples largely mirror the examples discussed in detail above. In one case Commerce appears to have created a new measure of inattentiveness, carelessness or inadequate record keeping. This occurred when it was clear from the record that the original suggestion to avoid inattentiveness, carelessness or inadequate record keeping had, in fact, been done. Nevertheless, substantial evidence on the record refutes each of Defendant's attempts to characterize Plaintiff's efforts as matters of "inattentiveness, carelessness, or inadequate record keeping." The examples are examined in turn.

First, Defendant indicates that "Ajmal's counsel admits that, despite extensions totaling approximately three weeks, Ajmal's counsel still only received the Section A response from Ajmal for review at 9:00 a.m. the day it was due." Def. Br. at 19. Defendant-Intervenor makes very similar arguments. DI Br. at 16-18. However, the record reflects that this delayed receipt was not the result of inattentiveness, carelessness, or inadequate record keeping. Instead, the record reflects that COVID-19 restrictions meant that Ajmal personnel were not able to access their offices and work sites. P.D. 50 at 2, P.D. 53 at 7. Notwithstanding any previous extensions, the sudden and unexpected governmental decision to bar people from their workplaces meant

---

[4] Ajmal declines to concede anything but agrees with Defendant that this is the language of the cited case.

11

that access to the records and materials necessary to prepare the Section A for timely submission to the attorneys in the United States was frustrated. In fact, the provision of Section A by 9:00 on the due date reflected the opposite of inattentiveness, carelessness, or inadequate record keeping. Personnel worked very hard to prepare the materials to the very best of their ability. The record in this case shows that the Section A response was not sent at 9 a.m. on the day it was due because of inattentiveness, carelessness, or inadequate record keeping. Thus, Commerce's argument on this point is unsupported by substantial evidence on the record.

Next Defendant indicates that "Ajmal's counsel states that the final submission was only put together by 3:00 p.m. that day, only two hours before the time limit for the submission." Def. Br. at 19. This is not evidence of inattentiveness, carelessness, or inadequate record keeping. This is evidence of diligent effort to meet the pending deadline.

Third, Defendant indicates that "{m}oreover, only after numerous failed attempts to finalize the document did the paralegal finalizing the document reach out to other staff for help. Even after this, only a single lawyer attempted to rectify the issues they encountered." Def. Br. at 19. Again, "numerous failed attempts" is not evidence of inattentiveness, carelessness, or inadequate record keeping. It is evidence of continued effort to meet the deadline. Tellingly, Commerce had previously indicated that "the firm could have enlisted the help of paralegals and/or attorneys . . ." PR 49 at 2-3. Ajmal informed Commerce that, in fact, at least one other additional attorney did begin assisting. PR 50 at 3-4. Only in the Issues and Decision Memorandum in October 2021, 18 months after the original suggestion that more personnel could have assisted, did Commerce criticize this additional assistance. PR 127 at 16. The record reflects the fact that additional personnel did assist with the filings and made every effort to make the filings timely. It is not evidence of inattentiveness, carelessness, or inadequate record

keeping that they were unsuccessful, and Commerce's evolving sense of "best effort" over the course of 18 months is unreasonable and not supported by evidence on the record.

Fourth, Defendant indicates that "at no point did Ajmal attempt to notify Commerce about the difficulties it was facing in filing its response, whether through official or unofficial channels until after the deadline had already passed." Def. Br. at 19. The record indicates because of Commerce's own remote work environment it was decided that a formal extension request was the appropriate course of action rather than placing a telephone call that would go to an unoccupied desk at Commerce. Rather than inattentiveness, carelessness, or inadequate record keeping this decision reflects thoughtful efforts to comply with Commerce's regulations and practices, as well as the awareness that Commerce personnel were not in their offices and did not appear to have regular access to their voicemails. The reality is that the effort to file a timely extension request also failed, but not because any actors were inattentive, careless, or practiced inadequate record keeping. Instead, it failed because the technical issues that made Section A impossible to complete also impacted the extension request. PR at 53, Attachment 2 ¶10.

None of the alleged examples of inattentiveness, carelessness, or inadequate record keeping cited by Defendant are supported by an examination of the record as a whole in this case. Instead, Commerce, Defendant, and Defendant-Intervenor conflate the test for "extraordinary circumstances" and "best efforts." In neither instance does the record support Commerce's determinations. As such, this Court should find them to be unsupported by the record and unlawful.

Finally, Defendant-Intervenor filed with the Court a Notice of Supplemental Authority, Docket No. 35, regarding a Court of International Trade decision issued after Defendant-Intervenor filed their brief. The case in that notice is Tau-Ken Temir LLP v. United States, Slip

Op. 22-82 (July 14, 2022). Any similarities between Tau-Ken and the case at bar are overwhelmed by the differing facts on the record and postures of the arguments. For instance, the Tau-Ken court indicated in its opinion that "there is no language in either Plaintiff's USCIT Rule 56.2 Brief or Reply Brief directly addressing how Commerce abused its discretion." Tau-Ken, Slip op. 22-82 at 9. The Tau-Ken court also noted that "Counsel submitted no affidavits from its staff or Plaintiffs detailing the technical or other difficulties . . ." Id. at 21-22. In light of the extensive record evidence and arguments presented in the case at bar establishing both Commerce's abuse of discretion as well as extraordinary circumstances that prevented the timely filing of the Section A response or the extension request, Tau-Ken does not inform this Court's analysis.

    C.   Commerce's Application of the Adverse Facts Available Rate in this Case is Disproportionate, Punitive and Not Supported by the Record

As part of Commerce's determination to reject both the extension request and Section A response in this matter, as well as the determination that Ajmal did not act to the best of its ability to cooperate with Commerce the agency imposed the Adverse Facts Available ("AFA") antidumping duty rate on Ajmal's imports. This rate was 54.27%. This was in contrast to historical rates of 6.43% or lower in previous reviews. The AFA rate here is inappropriate because the record does not support Commerce's underlying determinations (as discussed above). It is also inappropriate because it is so disproportionately high as to be punitive.

Ajmal adopts and reiterates its argument from Section V.C. of its Brief in Support of Its Rule 56.2 Motion for Judgment on the Agency Record of April 8, 2022. However, Ajmal also notes that Defendant has indicated that the AFA is a tool used by Commerce to "incentivize respondents to cooperate" which means "providing Commerce with complete and accurate information in a timely manner." Def. Br. at 21. The record in this matter is replete with

examples of Ajmal attempting to cooperate with Commerce. The record here does not reflect a lack of incentive, it reflects extraordinary circumstances that ultimately made it impossible to file a document due at 5:00 p.m. until 6:42 that night. To the extent Commerce chooses to rely on the "incentive" of a disproportionate and punitive rate, the decision continues to be an abuse of discretion.

## II.     CONCLUSION

As detailed above and the reasons explained herein, as well as in Plaintiff's Brief in Support of its Rule 56.2 Motion for Judgment on the Agency Record, dated April 8, 2022, Commerce's decision to reject both Ajmal's untimely request for an extension and subsequently Ajmal's delayed Section A response was an abuse of discretion. Furthermore, an assessment of the administrative record as a whole shows that Commerce's decision to assign Ajmal an adverse-inference-based rate is unsupported by the record. As such, Ajmal respectfully requests that this Court enter judgment for Plaintiff in this matter.

    Respectfully submitted,

    s/ David G. Forgue

    _____
    David G. Forgue

    **BARNES, RICHARDSON & COLBURN, LLP**
    303 East Wacker Drive
    Suite 305
    Chicago, Illinois 60601
    (312) 297-9555
    Counsel to Ajmal Steel Tubes & Pipes Ind. LLC

Dated:  August 26, 2022

## CERTIFICATE OF CONFORMITY

David G. Forgue certifies that the foregoing reply brief contains 4,622 words. Therefore, his document complies with the maximum 7,000 word count limitation set forth in the Standard Chambers Procedures 2(B)(1) of the United States Court of International Trade.

**BARNES, RICHARDSON & COLBURN, LLP**

By:   s/ David G. Forgue

David G. Forgue
303 East Wacker Drive, Suite 305
Chicago, Illinois 60601
(312) 297-9555

Dated:  August 26, 2022