A-520-807
Remand Redetermination
Slip Op. 22-121
POR:  12/01/2018 – 11/30/2019
**Public Document**
E&C/OII:  AM

***Ajmal Steel Tubes & Pipes Industries LLC. v. United States***
**Consol. Court No. 21-00587, Slip Op. 22-121 (CIT October 28, 2022)**
**Circular Welded Carbon Quality Steel Pipe from the United Arab Emirates**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

**I.  SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the Court) issued in *Ajmal Steel Tubes & Pipes Industries LLC. v. United States*, Slip Op.

22-121, Consol. Court No. 21-00587 (CIT 2022) (*Remand Order*).  This action arises out of the

2018-2019 antidumping duty (AD) administrative review of circular welded carbon-quality steel

pipe from the United Arab Emirates (UAE).[1]

The Court remanded to Commerce to accept and consider Ajmal Steel Tubes & Pipes

Industries LLC’s (Ajmal) response to section A of the AD questionnaire and determine a new

estimated dumping margin for Ajmal without relying on section 776 of Tariff Act of 1930, as

amended, (the Act) with respect to the filing of Ajmal’s response to section A of Commerce’s

AD questionnaire.  After reopening the record for Ajmal to submit its response to section A of

the AD questionnaire, Commerce has calculated Ajmal’s weighted-average dumping margin, per

the Court’s *Remand Order*.  As a result, Ajmal’s revised weighted-average dumping margin is

0.57 percent.

---

[1] *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates:  Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 FR 59364 (October 27, 2021) (*Final Results*).

## II.    BACKGROUND

Commerce published the *Final Results* on October 27, 2021.  As discussed in the *Final Results*, because Ajmal failed to submit all portions of its response to section A of Commerce's AD questionnaire by the established deadline, Commerce found that the use of facts available was warranted, pursuant to section 776(a) of the Act, and that Ajmal failed to cooperate to the best of its ability to comply with a request for information, within the meaning of section 776(b)(1) of the Act.  Consequently, Commerce assigned Ajmal the highest dumping margin alleged in the petition (*i.e.*, 54.27 percent), in accordance with section 776(b) of the Act and 19 CFR 351.308(a).[2]

In its October 28, 2022 opinion, the Court remanded the *Final Results* to Commerce, concluding that Commerce's rejection of Ajmal's section A questionnaire response was an abuse of discretion and instructing Commerce to accept and consider Ajmal's section A response and to determine a new estimated dumping margin for Ajmal that does not resort to section 776 of the Act with respect to the filing of the company's response to section A of the questionnaire.[3]

On November 4, 2022, we reopened the administrative record to permit:  (1) Ajmal to file its response to section A of the AD questionnaire; and (2) other interested parties to submit factual information to rebut, clarify, or correct this information.[4]  On November 4, 2022, Ajmal filed its response to section A of the AD questionnaire.[5]  On November 16, 2022, Commerce

---

[2] *See Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman, Pakistan, the Philippines, the United Arab Emirates, and the Socialist Republic of Vietnam:  Initiation of Less-Than-Fair-Value Investigations*, 80 FR 73708, 73712 (November 17, 2015).
[3] *See Remand Order* at 11.
[4] *See* Commerce's Letter, Reopening the Administrative Record, dated November 4, 2022.
[5] *See* Ajmal's Letter, "Section A Questionnaire Response," dated April 14, 2020, filed on November 4, 2022 (Ajmal AQR).

issued a supplemental questionnaire to Ajmal.[6]  On November 23 and December 2, 2022, Ajmal

submitted its response to this supplemental questionnaire.[7]

## III.    ANALYSIS

In accordance with the Court's instructions, we determined an estimated weighted-

average dumping margin for Ajmal based on its reported data.  We calculated this margin as

discussed below.

## A.  Normal Value Comparisons

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to

determine whether Ajmal's sales of subject merchandise from the UAE to the United States

during the period of review (POR) were made at less than normal value (NV), Commerce

compared the export price (EP) to the NV, as described in the "Export Price," and "Normal

Value" sections below.

1.  Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates weighted-average dumping

margins by comparing weighted-average NVs to weighted-average EP or constructed export

price (CEP) (*i.e.*, the average-to-average method) unless Commerce determines that another

method is appropriate in a particular situation.  In less-than-fair-value investigations, Commerce

examines whether to compare weighted-average NVs with the EPs or CEPs of individual sales

(*i.e.*, the average-to-transaction method) as an alternative comparison method using an analysis

consistent with section 777A(d)(l)(B) of the Act.

---

[6] *See* Commerce's Letter, Supplemental Questionnaire for Ajmal Steel Tubes & Pipes Industries LLC, dated November 16, 2022.
[7] *See* Ajmal's Letters, "Partial Remand Supplement Response," dated November 23, 2022; and "Partial Remand Supplement Response," dated December 2, 2022.

In numerous investigations and administrative reviews, Commerce has applied a

"differential pricing" analysis for determining whether application of the average-to-transaction

method is appropriate in a particular situation consistent with 19 CFR 351.414(c)(1) and section

777A(d)(1)(B) of the Act.[8]  Commerce finds that the differential pricing analysis is instructive

for purposes of examining whether to apply an alternative comparison method in this

administrative review.  Commerce will continue to evaluate its approach in this area based on

comments received in this review and the application of the differential pricing analysis on a

case-by-case basis, and on Commerce's additional experience with addressing the potential

masking of dumping that can occur when Commerce uses the average-to-average method in

calculating a respondent's weighted-average dumping margin.

The differential pricing analysis we applied examines whether there exists a pattern of

export prices for comparable merchandise that differ significantly among purchasers, regions, or

time periods.  The analysis evaluates all U.S. sales by purchasers, regions, and time periods to

determine whether a pattern of prices that differ significantly exists.  If such a pattern is found,

then the differential pricing analysis evaluates whether such differences can be taken into

account when using the average-to-average method to calculate the weighted-average dumping

margin.  The analysis incorporates default group definitions for purchasers, regions, time

periods, and comparable merchandise.  Purchasers are based on the reported consolidated

customer codes.  Regions are defined using the reported destination code, *i.e.*, ZIP code, and are

grouped into regions based upon standard definitions published by the U.S. Census Bureau.

---

[8] *See, e.g.*, *Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013); *see also Steel Concrete Reinforcing Bar from Mexico:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014); and *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

Time periods are defined by the quarter within the POR based upon the U.S. date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP or CEP and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's $d$ test" is applied.  The Cohen's $d$ coefficient is a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group.  First, for comparable merchandise, the Cohen's $d$ coefficient is calculated when the test and comparison groups of data for a particular purchaser, region, or time period each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise.  Then, the Cohen's $d$ coefficient is used to evaluate the extent to which the prices to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise.  The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's $d$ test:  small, medium, or large (0.2, 0.5, and 0.8, respectively).  Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists.  For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's $d$ test, if the calculated Cohen's $d$ coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's $d$ test.  If the value of sales to purchasers, regions, and time periods

that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the

identified pattern of prices that differ significantly supports the consideration of the application

of the average-to-transaction method to all sales as an alternative to the average-to-average

method.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test

accounts for more than 33 percent and less than 66 percent of the value of total sales, then the

results support consideration of the application of an average-to-transaction method to those

sales identified as passing the Cohen's *d* test as an alternative to the average-to-average method

and application of the average-to-average method to those sales identified as not passing the

Cohen's *d* test.  If 33 percent or less of the value of total sales passes the Cohen's *d* test, then the

results of the Cohen's *d* test do not support consideration of an alternative to the average-to-

average method.

If both tests in the first stage (*i.e.*, the Cohen's *d* test and the ratio test) demonstrate the

existence of a pattern of prices that differ significantly such that an alternative comparison

method should be considered, then in the second stage of the differential pricing analysis,

Commerce examines whether using only the average-to-average method can appropriately

account for such differences.  In considering this question, Commerce tests whether using an

alternative comparison method, based on the results of the Cohen's *d* and ratio tests described

above, yields a meaningful difference in the weighted-average dumping margin as compared to

that resulting from the use of the average-to-average method only.  If the difference between the

two calculations is meaningful, then this demonstrates that the average-to-average method cannot

account for differences such as those observed in this analysis and, therefore, an alternative

comparison method would be appropriate.  A difference in the weighted-average dumping

margins is considered meaningful if:  (1) there is a 25 percent relative change in the weighted-

average dumping margins between the average-to-average method and the appropriate

alternative method where both rates are above the *de minimis* threshold; or (2) the resulting

weighted-average dumping margins between the average-to-average method and the appropriate

alternative method move across the *de minimis* threshold.

2. Results of the Differential Pricing Analysis

Based on the results of the differential pricing analysis, we find that 86.46 percent of

Ajmal's U.S. sales, by value, pass the Cohen's *d* test[9] and confirms the existence of a pattern of

prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce

determines that the average-to-average method cannot account for such differences because the

weighted-average dumping margin crosses the *de minimis* threshold when calculated using the

average-to-average method and when calculated using an alternative comparison method based

on applying the average-to-transaction method to all U.S. sales.  Thus, for these final results of

redetermination, Commerce is applying the average-to-transaction method to all U.S. sales to

calculate the weighted-average dumping margin for Ajmal.

**B. Product Comparisons**

In accordance with section 771(16) of the Act, we considered all products produced and

sold by Ajmal in the UAE during the POR that fit the description of the scope of the *Order*,[10]

produced and sold by Ajmal in the home market that were in the ordinary course of trade to be

foreign like products for purposes of determining NV for the merchandise sold in the United

States.  Where there were no sales of identical merchandise in the home market made in the

---

[9] *See* Memorandum, "Margin Calculations for Ajmal Steel Tubes & Pipes Industries LLC (Ajmal) Pursuant to Draft Results of Redetermination," dated December 21, 2022 (Draft Remand Calculation Memorandum), at 2-3.
[10] *See Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman, Pakistan, and the United Arab Emirates:  Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Orders*, 81 FR 91906 (December 19, 2016) (*Order*).

ordinary course of trade to compare to U.S. sales, according to section 771(16)(B) of the Act, we

compared U.S. sales to sales of the most similar foreign like product made in the ordinary course

of trade.

In making the product comparisons, we matched foreign like products based on the

physical characteristics to the product sold in the United States.  In the order of importance, these

physical characteristics are as follows:  pipe specification, nominal outside pipe diameter,

nominal pipe wall thickness, coating, and end finish.

**C.  Treatment of Duties Under Section 232 of the Trade Expansion Act of 1962**

In March 2018, the President exercised his authority under section 232 of the Trade

Expansion Act of 1962, as amended,[11] and issued *Proclamation 9705* that mandated, to address

national security concerns, imposition of a global tariff of 25 percent on imports of steel articles

in order to reduce imports to a level that Commerce assessed would enable domestic steel

producers to use approximately 80 percent of existing domestic production capacity and thereby

achieve long-term economic viability through increased production.[12]  In considering whether

U.S. price should be adjusted for section 232 duties, we look to section 772 of the Act.  In

particular, section 772(c)(2)(A) of the Act directs Commerce to adjust EP and CEP for "the

amount, if any, included in such price, attributable to any additional costs, charges, or expenses,

and United States import duties … ."  Therefore, we find that the analysis here depends on

whether section 232 duties constitute "United States import duties" and whether the duties are

"included in such price."

The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) previously considered

whether certain types of duties constitute "United States import duties" for purposes of section

---

[11] *See* 19 USC 1862.
[12] *See Proclamation 9705 of March 8, 2018*, 83 FR 11625 (March 15, 2018) (*Proclamation 9705*).

772(c)(2)(A) of the Act.  In *Wheatland*, the Federal Circuit sustained Commerce's determination

not to adjust U.S. price in AD proceedings for section 201 safeguard duties under that statutory

provision.[13]  Having acknowledged Commerce's analysis of the legislative history to the

Antidumping Act of 1921, which "referred to 'United States import duties' as normal customs

duties and referred to ADs as 'special dumping duties' and that 'special dumping duties' were

distinguished and treated differently from normal customs duties," the Federal Circuit in

*Wheatland* agreed that "Congress did not intend all duties to be considered 'United States import

duties.'"[14]

    The Federal Circuit then found reasonable Commerce's analysis that section 201 duties

were more akin to ADs than "ordinary customs duties."[15]  In comparing section 201 duties with

ADs, the Federal Circuit found that:  (1) "{l}ike antidumping duties, {section} 201 duties are

remedial duties that provide relief from the adverse effects of imports"; (2) "{n}ormal customs

duties, in contrast, have no remedial purpose"; (3) "antidumping and {section} 201 duties, unlike

normal customs duties, are imposed based upon almost identical findings that the domestic

industry is being injured or threatened with injury due to the imported merchandise"; and (4)

"{section} 201 duties are like antidumping duties … because they provide only temporary relief

from the injurious effects of imports," whereas normal customs duties "have no termination

provision, and are permanent unless modified by Congress."[16]  In sustaining Commerce's

decision regarding section 201 duties in *Wheatland*, the Federal Circuit also held that "{t}o

---

[13] *See Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1363 (Fed. Cir. 2007) (*Wheatland*).
[14] *Id.*, 495 F.3d at 1361.
[15] *Id.*, 495 F.3d at 1362.
[16] *Id.*, 495 F.3d at 1362-63.

assess both a safeguard duty and an antidumping duty on the same imports without regard to the safeguard duty, would be to remedy substantially overlapping injuries twice."[17]

Section 232 duties are not akin to antidumping or 201 duties. *Proclamation 9705* states that it "is necessary and appropriate to adjust imports of steel articles so that such imports will not threaten to impair the national security … ."[18]  The text of section 232 of the Trade Expansion Act of 1962 also clearly concerns itself with "the effects on the national security of imports of the article."[19]  The particular national security risk identified in *Proclamation 9705* is that the "industry will continue to decline, leaving the United States at risk of becoming reliant on foreign producers of steel to meet our national security needs—a situation that is fundamentally inconsistent with the safety and security of the American people."[20]  In other words, section 232 duties are focused on addressing imports that threaten to impair national security, separate and apart from any function performed by antidumping and 201 safeguard duties to remedy injury to a domestic industry.

Furthermore, the Presidential Proclamation states that section 232 duties are to be imposed in addition to other duties, unless expressly provided for in the proclamations.[21]  The

---

[17] *Id.*, 495 F.3d at 1365.

[18] *See Proclamation 9705*, 83 FR at 11627 (emphasis added); *see also Proclamation 9711 of March 22, 2018*, 83 FR 13361, 13363 (March 28, 2018) (*Proclamation 9711*) ("In proclaiming this tariff, I recognized that our Nation has important security relationships with some countries whose exports of steel articles to the United States weaken our national economy and thereby threaten to impair the national security"); *Proclamation 9740 of April 30, 2018*, 83 FR 20683 (May 7, 2018) (*Proclamation 9740*) (similar); *Proclamation 9759 of May 31, 2018*, 83 FR 25857 (June 5, 2018) (*Proclamation 9759*) (similar); *Proclamation 9772 of August 10, 2018*, 83 FR 40429 (August 15, 2018) (*Proclamation 9772*) (similar); and *Proclamation 9777 of August 29, 2018*, 83 FR 45025 (September 4, 2018) (*Proclamation 9777*) (similar).

[19] *See* section 232(b)(1)(A) of the Trade Expansion Act of 1962 (emphasis added); *see also* section 232(a) of the Trade Expansion Act of 1962 (explaining that "{n}o action shall be taken… to decrease or eliminate the duty or other import restrictions on any article if the President determines that such reduction or elimination would threaten to impair the national security").

[20] *See Proclamation 9705*, 83 FR at 11627.

[21] *Id.*; *see also Proclamation 9711*, 83 FR at 13363; *Proclamation 9740*, 83 FR at 20685-87 ("All anti-dumping or countervailing duties, or other duties and charges applicable to such goods shall continue to be imposed, except as may be expressly provided herein."); *Proclamation 9759*, 83 FR at 25857; *Proclamation 9772*, 83 FR at 40430-31; and *Proclamation 9777*, 83 FR at 45025.  The proclamations do not expressly provide that section 232 duties receive different treatment.

Annex to *Proclamation 9740* refers to section 232 duties as "ordinary" customs duties, and it also states that "{a}ll anti-dumping or countervailing duties, or other duties and charges applicable to such goods shall continue to be imposed, except as may be expressly provided herein."[22]  Notably, there is no express exception in the Harmonized Tariff Schedule of the United States revision in the Annex.  Had the President intended that ADs would be reduced by the amount of section 232 duties imposed, the Presidential Proclamation would have expressed that intent.

For the reasons noted, and consistent with our treatment of section 232 duties in *CWP from Turkey*,[23] we have determined that section 232 duties should be treated as "United States import duties" for purposes of section 772(c)(2)(A) of the Act and thereby deducted from U.S. price as "U.S. Customs duties" where such duties are included in U.S. price.

## D.  Date of Sale

Section 351.401(i) of Commerce's regulations states that, in identifying the date of sale of the merchandise under consideration or foreign like product, Commerce normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business.  Additionally, Commerce may use a date other than the date of invoice if it is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[24]  Commerce has a long-standing practice of finding that, where shipment

---

[22] *See Proclamation 9740*, 83 FR at 20687.

[23] *See Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 84 FR 34345 (July 18, 2019), and accompanying Preliminary Decision Memorandum (PDM) at 11-13, unchanged in *Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 3616 (January 22, 2020) (*CWP from Turkey*), and accompanying Issues and Decision Memorandum (IDM) at Comment 3.

[24] *See* 19 CFR 351.401(i); *see also Allied Tube & Conduit Corp. v. (United States*, 132 F. Supp. 2d 1087, 1090 (CIT 2001) (quoting 19 CFR 351.401(i)).

date precedes invoice date, the shipment date better reflects the date on which the material terms of sale are established.[25]

Ajmal reported the date of the accounting invoice, which is always the same date as the date of shipment from the factory, as the date of sale for its home market sales.[26]  In the U.S. market, Ajmal reported the earlier of the accounting invoice or commerce invoice date as the date of sale.  Accordingly, because Ajmal's reporting is consistent with Commerce's practice, we relied on reported date of sale for all home market and U.S. sales.

## E.  Export Price

For all U.S. sales made by Ajmal, we used EP methodology, in accordance with section 772(a) of the Act, because the subject merchandise was first sold by the producer/exporter outside of the United States directly to the first unaffiliated purchaser in the United States prior to importation and CEP methodology was not otherwise warranted.

We calculated EP based on packed prices to unaffiliated purchasers in the United States. We made deductions, where appropriate, from the starting price for billing adjustments.  We also made deductions from the starting price, where appropriate, for movement expenses, *i.e.*, foreign inland freight expenses, foreign brokerage and handling expenses, foreign inland insurance expenses, and international freight expenses, in accordance with section 772(c)(2)(A) of the Act.

---

[25] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances:  Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 FR 76918 (December 23, 2004), and accompanying IDM at Comment 10; and *Notice of Final Determination of Sales at Less Than Fair Value:  Structural Steel Beams from Germany*, 67 FR 35497 (May 20, 2002), and accompanying IDM at Comment 2.

[26] *See* Ajmal's Letter, "Section B-D Questionnaire Response," dated July 6, 2020 (Ajmal BCDQR), at B-20 and C-8.

**F.  Normal Value**

    1.       Home Market Viability

In order to determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating NV, *i.e.*, the aggregate volume of home market sales of the foreign like product is equal to or greater than five percent of the aggregate volume of U.S. sales, we normally compare the respondent's volume of home market sales of the foreign like product to the volume of U.S. sales of the subject merchandise, in accordance with sections 773(a)(1)(A) and (B) of the Act.  If we determine that no viable home market exists, we may, if appropriate, use a respondent's sales of the foreign like product to a third country market as the basis for comparison market sales, in accordance with section 773(a)(1)(C) of the Act and 19 CFR 351.404.

In order to determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating NV (*i.e.*, the aggregate volume of home market sales of the foreign like product is five percent or more of the aggregate volume of U.S. sales), we compared the volume of Ajmal's home market sales of the foreign like product to the volume of its U.S. sales of subject merchandise, in accordance with section 773(a)(1)(A) and (B) of the Act and 19 CFR 351.404.

Based on this comparison, we determined that, pursuant to 19 CFR 351.404(b), the aggregate volume of Ajmal's home market sales of the foreign like product was greater than five percent of the aggregate volume of its U.S. sales of the subject merchandise.  Therefore, we used home market sales as the basis for NV, in accordance with section 773(a)(1)(B) of the Act.

2.      Affiliated-Party Transactions and Arm's-Length Test

During the POR, Ajmal made sales of the foreign like product in the home market to affiliated parties, as defined in section 771(33) of the Act.  Consequently, we tested these sales to ensure that they were made at arm's-length prices, in accordance with 19 CFR 351.403(c).  To test whether the sales to affiliates were made at arm's-length prices, where appropriate, we compared the unit prices of sales to affiliated and unaffiliated customers, net of all billing adjustments, discounts, movement charges, direct selling expenses, and packing expenses. Pursuant to 19 CFR 351.403(c), and in accordance with Commerce's practice, where the price to that affiliated party was, on average, within a range of 98 to 102 percent of the price of the same or comparable merchandise sold to the unaffiliated parties at the same level of trade (LOT), we determined that the sales made to the affiliated party were at arm's length.[27]  Ajmal's sales to affiliated customers during the POR all passed the arm's-length test.  Accordingly, we included all of Ajmal's sales to affiliated customers in our analysis.

3.      Level of Trade

Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, Commerce will calculate NV based on sales at the same level of trade (LOT) as the U.S. sales.  Sales are made at different LOTs if they are made at different marketing stages (or their equivalent).[28]  Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing.[29]  In order to determine whether the comparison market sales are at different stages in the marketing process than the U.S. sales, we examine the

---

[27] *See Antidumping Proceedings:  Affiliated Party Sales in the Ordinary Course of Trade*, 67 FR 69186 (November 15, 2002) (establishing that the overall ratio calculated for an affiliate must be between 98 and 102 percent in order for sales to be considered in the ordinary course of trade and used in the NV calculation).
[28] *See* 19 CFR 351.412(c)(2).
[29] *Id.*; *see also Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Notice of Intent Not To Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010), and accompanying IDM at Comment 7.

distribution system in each market, *i.e.*, the chain of distribution, including selling functions and class of customer (customer category), and the level of selling expenses for each type of sale.

Pursuant to section 773(a)(1)(B)(i) of the Act, in identifying LOTs for EP and comparison market sales, *i.e.*, NV based on either home market or third country prices,[30] we consider the starting prices before any adjustments.  For CEP sales, we consider only the selling activities reflected in the price after the deduction of expenses and profit under section 772(d) of the Act.[31]

When Commerce is unable to match sales of the foreign like product in the comparison market at the same LOT as the EP or CEP, Commerce may compare the U.S. sale to sales at a different LOT in the comparison market.  In comparing EP or CEP sales to sales at a different LOT in the comparison market, where available data make it possible, we make an LOT adjustment under section 773(a)(7)(A) of the Act.

In its questionnaire response, Ajmal provided information regarding the marketing stages involved in making its reported home market and U.S. sales, including a description of the selling activities performed for each channel of distribution.[32]  Selling activities can generally be grouped into five categories for our analysis:  provision of sales support,[33] provision of training

---

[30] Where NV is based on constructed value (CV), we determine the NV LOT based on the LOT of the sales from which we derive selling, general, and administrative expenses, and profit for CV, where possible.  *See* 19 CFR 351.412(c)(1).

[31] *See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1314-16 (Fed. Cir. 2001).

[32] *See* Ajmal AQR at 16-19; and Ajmal's Letter, "Partial Remand Supplement Response," dated November 23, 2022 (Ajmal SQR1), at Exhibit A-5.

[33] The Provision of Sales Support can include:  sales forecasting, strategic/economic planning, advertising, sales promotion, sales/marketing support, market research, and other related activities.  *See Acetone from Belgium: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 84 FR 49999 (September 24, 2019), and accompanying PDM at 17, unchanged in *Acetone from Belgium:  Final Determination of Sales at Less Than Fair Value*, 85 FR 8249 (February 13, 2020).

services,[34] provision of technical support,[35] provision of logistical services,[36] and performance of sales related administrative activities.[37]

In the home market, Ajmal reported that it made sales through one channel of distribution (*i.e.*, direct sales to traders and end users).[38]  Ajmal stated that it performed the following selling activities at the same level of intensity for all of its reported home market sales:  advertising; sales promotion; packing; inventory maintenance; order input/processing; provision of technical assistance; provision of cash discounts and rebates; provision of sales/marketing support; employment of direct sales personnel; payment of commissions; provision of warranty services; provision of guarantees; and arranging for freight and delivery.[39]  Accordingly, based on the selling function categories noted above, we find that Ajmal provided sales support, technical support, logistical services, and sales-related administrative activities.  Because all sales in the home market are made through a single distribution channel and the selling activities to Ajmal's customers did not vary within this channel, we determine that there is one LOT in the home market.

With respect to the U.S. market, Ajmal reported that it made sales through one channel of distribution (*i.e.*, direct sales to traders).[40]  Ajmal stated that it performed the following selling activities at the same level of intensity for all of its U.S. sales:  packing; order input/processing;

---

[34] The provision of training services can include:  personnel training/exchange, distributer/dealer training, and other related activities.

[35] The provision of technical support can include:  engineering services, technical assistance, and other related activities.

[36] The provision of logistical services can include:  inventory maintenance, post-sale warehousing, repacking, freight and delivery, and other related activities.

[37] The performance of sales related administrative activities can include:  order input/processing, rebate programs, warranty service, and other related activities.

[38] *See* Ajmal BCDQR at B-18 to B-19.

[39] *See* Ajmal SQR1 at Exhibit A-5.

[40] *See* Ajmal BCDQR at C-16 to C-17.

employment of direct sales personnel; provision of technical service; provision of warranty service; and arranging for freight and delivery.[41]

Accordingly, based on the selling function categories noted above, we find that Ajmal sales support, technical support, logistical services, and sales-related administrative activities. Because we find that there were no differences in the selling activities Ajmal performed to sell to its U.S. customers, we determine that all U.S. sales are at the same LOT.

Finally, we compared the U.S. LOT to the home market LOT, and we find that the selling functions Ajmal performed for its U.S. and home market customers do not differ significantly. Therefore, we determine that Ajmal's sales to the United States and home market during the POR were made at the same LOT, and, as a result, no LOT adjustment is warranted.

4.      Cost of Production Analysis

In accordance with section 773(b)(2)(A) of the Act, Commerce required that Ajmal provide CV and cost of production (COP) information to determine if there were reasonable grounds to believe or suspect that sales of the foreign like product had been made at prices that represented less than the COP of the product.  We examined Ajmal's reported cost data and determined that our quarterly cost methodology is not warranted.  Therefore, we are applying our standard methodology of using annual costs based on Ajmal's reported data.

a.    Calculation of COP

In accordance with section 773(b)(3) of the Act, we calculated COP based on the sum of costs of materials and fabrication for the foreign like product, plus amounts for general and administrative and interest expenses.  We relied on the COP data Ajmal reported without adjustments.[42]

---

[41] *See* Ajmal SQR1 at Exhibit A-5.
[42] *See* Draft Remand Calculation Memorandum.

  b. Test of Comparison Market Sales Prices

  On a product-specific basis, pursuant to section 773(b) of the Act, we compared the weighted-average COPs to the comparison market sales prices of the foreign like product, in order to determine whether the sales prices were below the COPs.  For purposes of this comparison, we used COPs exclusive of selling and packing expenses.  The sales prices were exclusive of any applicable billing adjustments, movement charges, direct and indirect selling expenses, and packing expenses.

  c. Results of the COP Test

  In determining whether to disregard comparison market sales made at prices below the COP, we examined, in accordance with sections 773(b)(1)(A) and (B) of the Act, whether:  (1) within an extended period of time, such sales were made in substantial quantities; and (2) such sales were made at prices which permitted the recovery of all costs within a reasonable period of time in the normal course of trade.  In accordance with sections 773(b)(2)(B) and (C) of the Act, where less than 20 percent of the respondent's comparison market sales of a given product are at prices less than the COP, we do not disregard any below-cost sales of that product because we determine that in such instances the below-cost sales were not made within an extended period of time and in "substantial quantities."  Where 20 percent or more of a respondent's sales of a given product are at prices less than the COP, we disregard the below-cost sales when:  (1) the sales were made within an extended period of time in "substantial quantities," in accordance with sections 773(b)(2)(B) and (C) of the Act; and, (2) based on our comparison of prices to the weighted-average COPs for the POR, they were at prices which would not permit the recovery of all costs within a reasonable period of time, in accordance with section 773(b)(2)(D) of the Act.

We found that, for certain products, more than 20 percent of Ajmal's home market sales during the POR were at prices less than the COP and, in addition, such sales did not provide for the recovery of costs within a reasonable period of time.  Therefore, we excluded these sales and used the remaining sales as the basis for determining NV, in accordance with section 773(b)(1) of the Act.

## G.  Calculation of NV Based on Comparison Market Prices

We calculated NV for Ajmal based on delivered prices to affiliated and unaffiliated customers.  We made deductions from the starting price, where appropriate, for billing adjustments and discounts, in accordance with 19 CFR 351.401(c).  We also made deductions for inland freight expenses, under section 773(a)(6)(B)(ii) of the Act.

We deducted home market packing costs and added U.S. packing costs, in accordance with section 773(a)(6)(A) and (B) of the Act.  For comparisons to EP sales, we made adjustments under section 773(a)(6)(C)(iii) of the Act and 19 CFR 351.410 for differences in circumstances of sale for imputed credit expenses, warranties, bank charges, other direct selling expenses, and commissions.

When comparing U.S. sales with home market sales of similar merchandise, we also made adjustments for differences in costs attributable to differences in the physical characteristics of the merchandise, in accordance with section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411.  We based this adjustment on the difference in the variable cost of manufacturing for the foreign like product and subject merchandise.[43]

## H.  Currency Conversion

We made currency conversions into U.S. dollars in accordance with section 773A of the

---

[43] *See* 19 CFR 351.411(b).

Act and 19 CFR 351.415(a), based on the exchange rates in effect on the dates of the U.S. sales, as certified by the Federal Reserve Bank.

## IV.    INTERESTED PARTY COMMENTS

On December 21, 2022, Commerce released the draft results of redetermination to all interested parties and invited parties to comment.[44]  No party filed comments on the Draft Results.  Accordingly, we have made no changes to the Draft Results for these final results.

## V.    FINAL RESULTS OF REDETERMINATION

We recalculated Ajmal's estimated weighted-average dumping margin according to the analysis described above.  As a result, the estimated weighted-average dumping margin is 0.57 percent.[45]  Because Ajmal's estimated weighted-average dumping margin calculated in these final results of redetermination is different from the dumping margin in the *Final Results*, we intend to issue amended final results, should the Court sustain these final results of redetermination.

1/23/2023



X

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[44] *See* Draft Results of Redetermination Pursuant to Court Remand**,** *Ajmal Steel Tubes & Pipes Industries LLC. v. United States*, Consol. Court No. 21-00587, Slip Op. 22-121 (CIT October 28, 2022), dated December 21, 2022 (Draft Results).
[45] *See* Draft Remand Calculation Memorandum.